# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　Respondent,<br><br>　　v.<br><br>GERALDO CASTRO DEJESUS,<br><br>　　　　　　Appellant. | No. 79073-1-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION<br><br>FILED: March 11, 2019 |

APPELWICK, C.J. — DeJesus appeals two convictions of first degree premeditated murder, two convictions of attempted first degree premeditated murder, and one conviction of first degree burglary. He argues that the trial court erred by not having a Frye[1] hearing and admitting ballistic identification evidence. He also asserts that the trial court abused its discretion in excluding other suspect evidence, limiting defense counsel's closing argument, and admitting evidence that, weeks after the shooting, he falsely reported to police a kidnapping and robbery. He asserts that cumulative error deprived him of his right to a fair trial. Finally, he argues that the evidence was insufficient for the jury to find that he had premeditated intent to kill two of the victims. We affirm.

## FACTS

At 2:18 a.m. on March 28, 2015, police responded to reports of a shooting at the Kariotis Mobile Home Park. When Deputy Brandon Myers arrived at the

---

[1] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

park, Justin Helwick came out of the trailer at space 47, and told him that someone inside had been shot. Inside the trailer, Myers found a man lying on his stomach, covered in blood. The man, Mathew Dean, told Myers that he had been shot three times. Myers radioed for a medical crew to help Dean, but the aid crew that had been dispatched was busy at another location at the park. Myers and Detective Cory Manchester, carried Dean to Myers's patrol car. They drove Dean to the entrance of the park, where they met medics who moved Dean into an ambulance. Dean survived but required multiple surgeries.

At 2:28 a.m., Patrol Sergeant Mike Davis also arrived at the scene. Helwick directed Davis and fellow officers to the trailer at space 21, where the shooting occurred. The officers surrounded the trailer. Davis heard screams from inside, and then Jalisa Lum, carrying her two year old son, Kaden, exited the home. Kaden[2] had a bullet wound above his eye. Officer Jeff Schaefer attempted cardiopulmonary resuscitation on Kaden. Medical aid arrived, and Schaefer took Kaden to the ambulance. Kaden died. According to the autopsy, the cause of Kaden's death was a gunshot wound to the head.

Davis, along with three other officers, went inside the trailer. Toward the back of the home, the officers found a woman who had been shot and appeared to be dead. That woman, Heather Kelso, had been shot once in each thigh and twice in the head.

Lum was Kelso's roommate. Lum moved into Kelso's trailer at space 21 near the beginning of 2015. On March 27, 2015, Dean went to Kelso's home. That

---

[2] We use Kaden's first name for clarity.

2

night, their romantic relationship progressed further than it had in the past. Around 1:00 a.m., Kelso went to the back porch to smoke a cigarette. Dean heard gunshots and ran to the porch. Kelso was holding her legs and yelling that she had been shot. Dean pulled her into the house and laid her down. He then went into Lum's room, and felt that he had been shot. He jumped through the window, breaking it, and ran to Helwick's trailer.

Lum was lying in her bed when she heard Kelso say, without "rais[ing] her voice hardly," that she had been shot. Lum heard more gunshots and heard Dean ask her for help. Lum then got out of her bed and, with her body, covered her son on the ground. While she was on the floor, she heard "a lot of gunshots." Then, she heard someone she thought was Dean come through her room and ask her for help or to call 911. After she heard the window shatter, Lum testified that "somebody opened up the door again, [and] shot towards me and Kaden." She felt the bullet go by her face, and pretended to be dead. After she did not hear anything for about three minutes, she reached for her cellphone, which she had placed on the floor before she went to sleep. She then called 911.

After the shooting, police quickly identified Geraldo DeJesus as a person of interest. In the past, DeJesus and Kelso had a relationship, had lived together, and had a child together. Their relationship was rocky and remained conflicted during Kelso's pregnancy. They ended their relationship after the child was born.

On February 24, 2015, Kelso filed a report about DeJesus with Child Protective Services (CPS). The same day, she got a temporary domestic violence protection order against DeJesus. Kelso got a permanent protection order against

3

DeJesus on March 5, 2015. In March 2015, DeJesus expressed frustration with not being able to see his daughter. On March 24, CPS mailed a letter to DeJesus, notifying him that it had closed the investigation.

On March 27, 2015, Kelso had a confrontation with DeJesus at a McDonald's restaurant. She called Elizabeth Forrester, Kelso's surrogate mother and friend, and told her about the confrontation. Later that day, DeJesus visited his and Kelso's child, who was sick and staying with Forrester.

Around 5:50 a.m. after the shooting, police found DeJesus's car in a parking lot next to an apartment building in Port Orchard. Ivy Rose DeJesus, DeJesus's ex-wife, lived in the building. A heavy police presence set up outside the building, and, using a loudspeaker-like device, called for DeJesus to exit.

After DeJesus exited, police handcuffed him, read him his Miranda[3] rights, and interviewed him in the front passenger seat of a detective's car. The officers told DeJesus that they were investigating the murder of Kelso and an infant. Detective Michael Grant testified that DeJesus's reaction was "indifferent." Grant noticed that DeJesus had a scrape on his left shin. DeJesus told the police that he had injured his leg, and his hip, at work. The detectives asked DeJesus what he had been wearing the night before, and he told them that he had changed clothes. He gave the police permission to collect the items that he said he had been wearing. The police collected a brown hooded sweatshirt with a zipper, a gray T-shirt, a pair of blue jeans, and another T-shirt.

---

[3] Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Police searched Ivy's[4] residence. They found a Smith and Wesson gun case. Inside the case, police found a loaded magazine, a cleaning brush, and some literature about the gun. A spent shell casing was inside an envelope tucked inside the inner lining of the gun case.[5] The magazine had 15 Federal brand 9mm hollow-point rounds in it.

A former Washington State Patrol Crime Laboratory analyst examined evidence in this case. She compared the cartridge case from the Smith and Wesson envelope and the cartridge casings from the scene. She concluded that the cartridge casings from the scene had consistent markings with the casing found in the Smith and Wesson envelope, indicating that they were fired from the same gun.

The State charged DeJesus with first degree premeditated murder of Kelso, with aggravating circumstances (count 1); first degree felony murder of Kelso, with special allegations (count 2); first degree burglary, with special allegations (count 3); first degree premeditated murder of Kaden, with special allegations (count 4); first degree felony murder of Kaden, with special allegations (count 5); first degree murder by extreme indifference of Kaden, with special allegations (count 6); attempted first degree premeditated murder of Dean, with a special allegation (count 7); and attempted first degree premeditated murder of Lum, with a special allegation (count 8). The jury found DeJesus guilty as charged. By agreement,

---

[4] We use Ivy's first name for clarity.
[5] The gun was test fired by the gun manufacturer, who stored the test-fired cartridge case in lining of the gun case.

the trial court vacated the felony murder convictions to avoid double jeopardy. The court sentenced DeJesus to life imprisonment. DeJesus appeals.

## DISCUSSION

DeJesus makes six arguments. First, he argues that the trial court erred in failing to conduct a Frye hearing and admitting expert testimony on ballistic identification. Second, he argues that the trial court abused its discretion in excluding other suspect evidence. Third, he argues that the trial court violated his right to counsel by restricting counsel's closing argument. Fourth, DeJesus argues that the trial court abused its discretion in admitting evidence that he told police that he had been kidnapped and robbed a few weeks after the shooting. Fifth, he argues that cumulative error deprived him of his right to a fair trial. And sixth, he argues that the evidence was insufficient to support findings that he premeditated the murder of Kaden and attempted murder of Lum.

Many of DeJesus's arguments focus on the various evidentiary rulings the trial judge made during the trial. A trial court's evidentiary rulings are reviewed for abuse of discretion. In re Pers. Restraint of Duncan, 167 Wn.2d 398, 402, 219 P.3d 666 (2009). A trial court abuses its discretion if its decision is manifestly unreasonable or is based on untenable grounds, or for untenable reasons. Id. A decision is based on untenable grounds or for untenable reasons if the trial court applies the wrong legal standard or relies on unsupported facts. Id. at 403.

6

I. _Frye_ Test

DeJesus argues first that, because it was inadmissible under the _Frye_ standard, the trial court erred in allowing the State's witness to testify about ballistics identification.

A. General Acceptance

Under _Frye_, the primary goal is to determine whether the evidence offered is based on established scientific methodology. Anderson v. Akzo Nobel Coatings, Inc., 172 Wn.2d 593, 603, 260 P.3d 857 (2011). Specifically, the court considers "(1) whether the underlying theory is generally accepted in the scientific community and (2) whether there are techniques, experiments, or studies utilizing that theory which are capable of producing reliable results and are generally accepted in the scientific community." State v. Riker, 123 Wn.2d 351, 359, 869 P.2d 43 (1994). If there is a significant dispute between qualified experts as to the validity of scientific evidence, it may not be admitted. State v. Copeland, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996).

Questions of admissibility under _Frye_ are reviewed de novo. Anderson, 172 Wn.2d at 600. "The reviewing court will undertake a searching review which may extend beyond the record and involve consideration of scientific literature as well as secondary legal authority." Copeland, 130 Wn.2d at 255-56. However, after general acceptance of a methodology in the scientific community, application of the methodology to a particular case is a matter of weight and admissibility under ER 702. State v. Baity, 140 Wn.2d 1, 10, 991 P.2d 1151 (2000); State v. Lizarraga, 191 Wn. App. 530, 566, 364 P.3d 810 (2015).

B. Ballistics Identification

DeJesus argues that there is a "significant dispute among qualified scientists in the relevant scientific community about the validity of ballistic identification methodology." (Boldface omitted.) He argues that the trial court erred in refusing to hold a Frye hearing, and in doing so, relieved the State of its burden of proving general acceptance of the scientific methodology by a preponderance of the evidence. Citing State v. Cauthron, 120 Wn.2d 879, 846 P.2d 502 (1993) overruled on other grounds by State v. Buckner, 133 Wn.2d 63, 941 P.2d 667 (1997), he asserts that trial courts must undertake the Frye analysis if one party produces new evidence that questions the general acceptance or lack thereof as to a theory within the relevant scientific community. To demonstrate that this dispute exists, DeJesus relies on 2008[6] and 2009[7] reports from the National Research Council (NRC) of the National Academy of Sciences, 2016 President's Council of Advisors on Science and Technology's (PCAST) report,[8] "scholarly challenges," and declarations from two defense experts.

---

[6]COMM. TO ASSESS THE FEASIBILITY, ACCURACY, & TECH. CAPABILITY OF A NAT'L BALLISTICS DATABASE, NAT'L RESEARCH COUNCIL, BALLISTIC IMAGING (2008), www.nap.edu/read/12162/chapter/1 [https://perma.cc/37GE-4S4C].

[7] COM ON IDENTIFYING THE NEEDS OF THE FORENSIC SCI. COMTY. ET AL., NAT'L RESEARCH COUNCIL, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (2009), www.nap.edu/read/12589/chapter/1 [https://perma.cc/3GXP-RCFR].

[8] PRESIDENT'S COUNCIL OF ADVISORS ON SCI. AND TECH., EXEC. OFFICE OF THE PRESIDENT, FORENSIC SCIENCE IN CRIMINAL COURTS: ENSURING SCIENTIFIC VALIDITY OF FEATURE COMPARISON METHODS (Sept. 2016), https://www.broadinstitute.org/files/sections/about/PCAST/2016%20pcast-forensic-science.pdf [https://perma.cc/B6G9-EBPX] (hereinafter Forensic Science in Criminal Courts).

1. Relevant Community

The State argues that there is no significant dispute within the relevant community. It argues that the relevant community is that of toolmark examiners, and that DeJesus does not rely on criticism from within that community, but rather from outside of it. Quoting In re Detention of Pettis, 188 Wn. App. 198, 206, 352 P.3d 841 (2015), it also asserts that the "'standard does not require unanimity.'"

Quoting State v. Russell, 125 Wn.2d 24, 41, 882 P.2d 747 (1994), DeJesus contends that the relevant community includes "'the community of scientists familiar with the challenged theory.'" He argues, therefore, that the relevant community includes those who contributed to the PCAST report and the 2008 and 2009 NRC reports, as well as the defense experts in support of his Frye motion.

In Russell, the court stated,

> This reference to the scientific community at large is important—a court looks not only to the technique's acceptance in the forensic setting but also to its acceptance by the wider scientific community familiar with the theory and underlying technique. Under Frye, the court looks for "general acceptance in the appropriate scientific community", that is, acceptance by the community of scientists familiar with the challenged theory. Furthermore, Frye requires only general acceptance, not full acceptance, of novel scientific methods. This only makes sense since full acceptance would obviate the necessity of a Frye hearing.

125 Wn.2d at 41 (internal citations omitted) (parenthetical omitted) (quoting Cauthron, 120 Wn.2d at 896-97).

The trial court in Russell held a two-week Frye hearing over whether the polymerase chain reaction (PCR) testing of DNA (deoxyribonucleic acid) had gained sufficient scientific acceptance to admit the results of such testing in court.

Id. at 37-38, 41. On appeal, Russell relied on a report prepared by the National Academy of Sciences' Committee on DNA Technology in Forensic Science. Id. at 44. The report stated that the PCR test had not yet achieved full acceptance in the forensic setting, but it also acknowledged the admissibility of DNA evidence, as long as certain precautions were taken. Id. at 46. Our Supreme Court reasoned that, whether some of the problems Russell identified occurred in the forensic setting, it did not affect the general scientific acceptance of PCR methodology. Id. at 50. The court stated,

> The concern of Frye is whether the evidence being offered is based on generally accepted scientific theory and methodology. Frye is not concerned with the acceptance of the results of a particular study or of the particular testing procedures followed in the case before the court. These concerns are addressed under the ER 702 inquiry of whether the expert testimony would be helpful to the trier of fact. . . .
> If the evidence survives an ER 702 challenge, however, these questions then are considered by the trier of fact in assessing the weight to be given the evidence.

Id. at 51 (internal citations omitted). The court held that the principles and methodology underlying PCR analysis had been generally accepted by the scientific community and were properly admitted under Frye. Id. at 54.

As in Russell, here the PCAST report acknowledged its own dubious value to courts, stating, "Judges' decisions about the admissibility of scientific evidence rest solely on legal standards; they are exclusively the province of the courts and PCAST does not opine on them." Forensic Science in Criminal Courts, at 4.

In the section focusing on toolmark evidence, the PCAST report stated that "the foundational validity of the field had not been established." Id. at 11. It continued,

> Whether firearms analysis should be deemed admissible based on current evidence is a decision that belongs to the courts. If firearms analysis *is* allowed in court, the scientific criteria for validity as applied should be understood to require clearly reporting the error rates seen in the one appropriately designed black-box study.

Id. at 12. The report also states,

> Validity as applied would also require . . . that an expert testifying on firearms analysis (1) has undergone rigorous proficiency testing on a large number of test problems to measure his or her accuracy and discloses the results of the proficiency testing and (2) discloses whether, when performing the examination, he or she was aware of any other facts of the case that might influence the conclusion.

Id.

Just like the report on which the defendant in Russell relied to question the validity of PCR testing, the PCAST report here does not indicate that the toolmark testing is without merit. See 125 Wn.2d at 46. Instead, it urges experts to use certain approaches and methodology. See id.; Forensic Science in Criminal Courts, at 11. As in Russell, the reports on which DeJesus relies do not affect the general scientific acceptance of ballistic identification. Instead, the problems they espouse bear on the question of reliability of the individual test and tester at issue. These questions are then considered by the trier of fact in assessing the weight to be given the evidence. Here, DeJesus presented extensive testimony from two experts who testified to essentially all the alleged failings of toolmark identification. The jury was then free to weigh the evidence before it.

2. Other Jurisdictions

The court in Russell looked to other jurisdictions and found that, they too, had concluded that the shortcomings discussed in the scholarly report did not bar the evidence's admissibility. 125 Wn.2d at 47-48. Here, the State concedes that no Frye jurisdiction has considered the issue since the 2016 PCAST report.

But, a number of courts have rejected the defendants' positions on the invalidity of toolmark identification since the NRC reports. See People v. Robinson, 2 N.E. 3d 383, 402 (Ill. App. Ct. 2013) ("[F]ederal and state courts have had occasion to revisit the admission of expert testimony based on toolmark and firearms identification methodology . . . . [M]easured against the standards of both Frye and Daubert,[9] . . . Courts have considered scholarly criticism of the methodology, and occasionally placed limitations on the opinions experts may offer based on the methodology. Yet the judicial decisions uniformly conclude toolmark and firearms identification is generally accepted and admissible at trial. Accordingly, we conclude the trial court did not err in ruling the testimony in this case was admissible and did not require a Frye hearing."); see also United States v. Otero, 849 F. Supp. 2d 425, 430, 435 (D.N.J. 2012) (under the Daubert standard, holding that "the evidence submitted by the Government demonstrates the general acceptance of the Association of Firearms and Toolmark Examiners (AFTE) theory among professional examiners as a reliable method of firearms and toolmark identification"), aff'd, 557 F.App'x 146 (3rd Cir. 2014)).

---

[9] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

Courts from around the country have universally held that toolmark analysis is generally accepted. DeJesus has not cited to judicial authority holding that the toolmark analysis is not generally accepted. Even in cases where the trial court did not hold a Frye hearing, the appellate court did not reverse the decision to admit the evidence. See, e.g., Robinson, 2 N.E. 3d at 402.

The trial court addressed DeJesus's motion to suppress ballistics evidence and for a Frye hearing over the course of several hearings. The trial court expressly found that the toolmark testing and analysis the expert in this case used is a generally accepted technique. Once the evidence is accepted as scientifically acceptable, the question of admissibility turns on whether the witnesses qualify as experts and whether the proffered testimony would be helpful to the trier of fact. State v. Pigott, 181 Wn. App. 247, 251, 325 P.3d 247 (2014).

Under the circumstances here, the trial court did not err in admitting the evidence under ER 702. Any objections that DeJesus had to the ballistics identification addressed the weight of the testimony, not its admissibility.

II.   Other Suspect Evidence

DeJesus argues second that the trial court abused its discretion in excluding other suspect evidence. He argues that there is evidence showing a "logical connection between [James] Trammell and the commission of the crime." And, he asserts that an "adequate nexus" also ties James Houston as an alternative suspect to the crime.

A defendant's right to an opportunity to be heard in his defense, including the rights to examine witnesses against him and to offer testimony, is basic in our

system of jurisprudence. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). But, that right is not absolute, and there is no constitutional right to present irrelevant evidence. Id. "The standard for relevance of other suspect evidence is whether there is evidence 'tending to connect' someone other than the defendant with the crime."[10] State v. Franklin, 180 Wn.2d 371, 381, 325 P.3d 159 (2014) (quoting Sate v. Downs, 168 Wash. 664, 667, 12 P.2d 1 (1932)). Stated otherwise, "[S]ome combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime." Id. This inquiry, properly conducted, focuses upon whether the evidence offered tends to create a reasonable doubt as to the defendant's guilt, not whether it establishes the guilt of the third party beyond a reasonable doubt. Id. This court reviews trial court decisions on the admission of evidence for abuse of discretion. State v. Perez-Valdez, 172 Wn.2d 808, 814, 265 P.3d 853 (2011).

A. Trammel

Before trial, DeJesus moved to admit other suspect evidence, naming Trammell. DeJesus argues that Trammell had the motive, means, and opportunity to commit the crime. Trammell was Kaden's father. He was not in a relationship with Lum, Kaden's mother, at the time of the shooting. Kaden alternated living with both Trammell and Lum, spending about half his time with each parent. Trammell did not meet Kelso until Lum moved in with her, about three weeks before the shooting.

---

[10] Our Supreme Court purposefully adopted this language, putting aside the "clear nexus" language this court used in the earlier case, State v. Rafay, 168 Wn. App. 734, 800, 285 P.3d 83 (2012).

DeJesus likens his other suspect evidence to that in Franklin. There, the trial court excluded evidence that Franklin's live-in girlfriend, Hibbler, had sent threatening e-mails to his other girlfriend. 180 Wn.2d at 372. Our Supreme Court reversed, finding that Hibbler had the motive (jealousy), the means (access to the computer and e-mail accounts at issue), and the prior history (of sending threatening e-mails to Fuerte regarding her relationship with Franklin) to support Franklin's theory of the case. Id. at 372-73. And, it stated, "[T]he excluded evidence, taken together, amounts to a chain of circumstances that tends to create reasonable doubt as to Franklin's guilt." Id. at 382.

This case is distinguishable from Franklin. DeJesus argues that Trammell had the motive to commit the crime, because Trammell had animosity towards Lum and a history of domestic violence towards her. In his motion to admit other suspect evidence, DeJesus offered Lum's petition for a protection order against Trammell. Unlike the petition Kelso had filed against DeJesus, Lum filed her petition against Trammell after the shooting. In the petition, Lum describes Trammell's past acts of domestic violence, but also describes the shooting and the death of their child as a turning point. She writes,

> March 28, 2015 my baby was shot in [a] Bremerton shooting. Sence [sic] that day my baby's dad, James, has become very unpredictable and aggressive towards me. . . . We have had a very difficult relationship all along and [I] have never felt fearful of him, like I do now.

15

When DeJesus moved to admit other suspect evidence, he argued that, like himself, Trammell was an "estranged boyfriend[]," shared a small child with a woman living in the mobile home, had incidents of domestic violence with his estranged girlfriend, and owned a Smith and Wesson gun.

The trial court denied DeJesus's pretrial motion to present other suspect evidence, stating,

> I'm not able to, based on what's been presented this morning -- I don't believe that the strength of the defendant's showing of the -- some tangible connection between the other person, Mr. Trammell, and the crime charged is sufficient.
>
> There is an insufficient train of facts or circumstances as presented in the offers of proof. And so I'm going to deny the motion with regards to other suspect evidence in this matter.
>
> However . . . you have leave to renew this motion pending additional information certainly and perhaps most importantly what I'm hearing crime lab information with regards to the firearm that Mr. Trammell turned over. So I guess it remains to be seen what that says, but if you believe it's relevant, you certainly have leave to refile your motion.

At the time of the shooting, the parenting arrangement between DeJesus and Kelso was significantly different from the arrangement between Trammell and Lum. In the month of the shooting, DeJesus expressed resentment because he felt Kelso was keeping their daughter from him. By contrast, Trammell and Lum were alternating days and splitting time with their child equally. And, on the day before the shooting, Trammell agreed to let Kaden spend the night with Lum, even though it was Trammel's turn to host him. This demonstrates that, at the time of the shooting, Trammell and Lum's relationship was amicable, at least in regards to parenting their child. And, Trammell knew that on the night of the shooting Lum

16

had their child, with whom he had an invested relationship. There is also no evidence in the record of Trammel having animosity toward Kelso or Dean.

DeJesus also argues that Trammell had the means to commit the crime, because he owned firearms. In his pretrial motion, DeJesus specifically argued that Trammell also owned a Smith and Wesson gun, and "was familiar with firearms and knew how to use them." DeJesus did not argue that Trammell had possession of DeJesus's gun or of any other third parties' gun. The fact that Trammell owned a firearm does not sufficiently link him to the crime.

Finally, DeJesus argues that Trammell had the opportunity to commit the crime, because he showed up at the crime scene "shortly after the shooting, demonstrating his proximity." Trammell lived approximately 50 to 60 minutes from the mobile home park. He testified that, the night of the shooting, his mother woke him up and told him that Kaden had been shot. Together, Trammell and his mother drove to the hospital, looking for Kaden, and then went to the park where the shooting occurred. His arrival at the scene after learning that his son had been shot is not a circumstance pointing to a nonspeculative link connecting him to the crime.

When the trial court denied his motion, DeJesus had not shown that Trammell had the motive, means, or opportunity to commit the crime. The decision to exclude the evidence was not error.

And, evidence admitted subsequently rendered any possible error in the decision to exclude harmless. A forensic scientist with the Washington State Patrol Crime Laboratory tested Trammell's Smith and Wesson gun and compared it with

casings from the scene. He testified that the "fired cartridge case that was collected from the scene was eliminated as having been fired from the Smith [and] Wesson MMP firearm" that he examined.

DeJesus's allegations about Trammell do not amount to a chain of circumstances that creates reasonable doubt as to DeJesus's guilt, as in Franklin.

B. Houston

During the trial, DeJesus renewed his motion to admit other suspect evidence, this time focusing on Houston. DeJesus alleged that Houston sold Kelso drugs. DeJesus argued,

> [T]here was an individual named James Houston that was Heather's pill dealer. . . . Mr. DeJesus told the detectives that she owed money to this particular person, that he was her pill dealer, that she used pills. . . .
>
> . . . [W]e have evidence that she had a substantial bit of cash on her person when she was found. . . .
>
> . . . [I]t's a nexus test on the other suspect. We're renewing the motion to be able to explore the other suspect evidence. . . .
>
> . . . There's a sufficient nexus to argue another suspect, being James Houston or some other unknown person associated with Mr. Houston.

On appeal, DeJesus argues that Houston had motive, because he "threatened Kelso" on March 26, and was a "drug dealer [who] wanted her to pay up."[11] He asserts that Houston had means, because "firearms are widely

---

[11] There is no citation in the brief, but DeJesus is most likely referring to defense counsel's argument at trial that Houston sent Kelso a text message less than 24 hours before the shooting. The text message, DeJesus alleged, "indicat[ed] that [Houston] had sold her drugs and that she still owed him money for it."

available." He argues that Houston had opportunity, stating that "Kelso expected him to be coming over to her residence." And, he argues that there was a hostile interaction shortly before her death.

The court found that DeJesus did not meet the bar to present other suspect evidence as to Houston, stating, "I'm also not finding at this point that, through this witness at this time, there's a sufficient nexus between Heather's drug use and what we're referring to as other suspect evidence and that test."

DeJesus alleges that Houston's motive for the shooting was to recover money, but there was money found in Kelso's wallet at the scene. Next, DeJesus claims that Houston had the means and the opportunity to commit the crime. But, arguing that guns are widely available does not establish that someone has a gun. It is merely conjecture. And, nothing places him at or near the scene of the crime.[12] The mere fact that the person sent the victim a "hostile" text message the day before is insufficient support for other suspect evidence. See State v. Wade, 186 Wn. App 749, 757, 767, 346 P.3d 838 (2015) (The trial court excluded other suspect evidence regarding the victim's ex-boyfriend, who had left several threatening messages on the victim's phone. This court held that the trial court did not abuse its discretion, because there was no physical evidence connecting the

---

[12] DeJesus argued at trial that Helwick saw a "tall, black man" "'lurking'" outside of Kelso's trailer on March 27. Helwick testified that he told police that he saw "a person at Heather's house that was black." DeJesus described Houston to police as a 50 year old black man. But, there was no testimony or evidence that Houston was at the scene during the shooting.

proffered other suspect to the murder and no evidence that he was anywhere near the victim's apartment when the crime occurred.).

The trial court did not abuse its discretion in finding that there was not sufficient evidence creating a nonspeculative link from Houston to the charged crime.

## C. Constitutionality of the Washington Standard

DeJesus argues in the alternative that, if the trial court properly excluded the other suspect evidence under the Washington standard, the standard is unconstitutional under Holmes v. South Carolina, 547 U.S. 319, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006).

In Holmes, the trial court excluded other suspect evidence. 547 U.S. at 323-24. The United States Supreme Court reasoned that, under the South Carolina rule,

> [T]he trial judge does not focus on the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt. Instead, . . . [i]f the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues.

Id. at 329. The Court held that the rule did not "focus the trial on the central issues by excluding evidence that has only a weak logical connection to the central issues," and therefore violated a defendant's right to have a meaningful opportunity to present a complete defense. Id. at 330-31.

20

This court previously rejected an essentially identical claim about the constitutionality of the Washington other suspect standard in Rafay. 168 Wn. App. at 802-03. This court stated,

> [T]he Holmes court noted its approval of state rules limiting other suspect evidence, including the rule in Washington, when the evidence was speculative or remote or did not tend to prove or disprove a material fact. Holmes therefore does not support the claim that Washington's other suspect limitation is unconstitutional.

Id. And, in Franklin, while reversing the trial court, our Supreme Court distinguished the Washington standard from the South Carolina one that the Holmes Court held unconstitutional. See 180 Wn.2d at 382 ("[T]he rule applied by the trial court in this case contradicts this constitutional standard and prior state case law.").

Here, the trial court did not compare the relative strength of the evidence against DeJesus versus the evidence against the alleged other suspects, like the inquiry Holmes deemed unconstitutional. Instead, it looked only at the strength of offered evidence regarding Trammell and Houston. In declining to find a connection between Trammell and the crime, the court stated,

> I do have to . . . make a finding that the defendant has produced a necessary train of facts or circumstances linking the other suspect to the crime. And that admissibility that I look at is based on the strength of the defendant's showing of some tangible connection between the other person and the crime charged.

The trial court properly applied the correct standard under Franklin. And, the Washington other suspect evidence standard, as applied here, is constitutional under Holmes.

III. Right to Counsel

DeJesus argues third that the trial court violated his right to counsel in restricting defense counsel's closing argument.

The trial court should in all cases restrict the argument of counsel to the facts in evidence. State v. Frost, 160 Wn.2d 765, 772, 161 P.3d 361 (2007). However, despite their broad discretion, trial courts cannot compel counsel to reason logically or draw only those inferences from the given facts which the court believes to be logical. Id. Where a trial court unduly limits the scope of defense counsel's closing argument, it may infringe upon a defendant's Sixth Amendment right to counsel. Id. at 773. This court reviews a trial court's action limiting the scope of closing argument for abuse of discretion. Id. at 771.

To understand DeJesus's argument, some background on his closing argument is needed. During closing, defense counsel argued that, while it was reasonable for the police to have investigated DeJesus, they failed to explore other theories and suspects. He stated, "Five months, they did everything they could to tie Mr. DeJesus to the shooting. . . . [A]s of March 28 at 4:30, but certainly by March 31, there's one suspect, and everything else is excluded. Everyone else is excluded." After some time, he mentioned Houston, stating,

> And in particular, they did not do a thorough investigation of James Houston. Now, James Houston was a name that was provided to them as early as March 28. They knew James Houston is [sic] a possible suspect.
>
> By the way, I want to be clear on one thing. I am not saying James Houston is the shooter, because I don't have any evidence that he's the shooter. Why do I not have any evidence he's the shooter?

22

. . . .

. . . Because law enforcement failed. Law enforcement did not investigate James Houston, despite the fact that he was a suspect -- he was a known suspect as early as March 28. Why did not they not investigate him? Because they only had one suspect. . . . That was Mr. DeJesus. Everyone else is excluded.

By the way, Justin Helwick described seeing a tall black man -- he used the word "lurking" -- outside of Space 21 on March 27. He's lurking at the shooting scene within hours of the shooting, and Mr. Houston is a tall black man.

Then, using PowerPoint slides, he discussed text messages between Kelso and Houston. One slide, captioned "Question," stated,

- How do we reconcile Kelso's statement her check bounced and she cannot pay her drug dealer the money she borrowed with the fact she had between $600-800 cash in her wallet?
- September 3, 2014 — "Can you pawn your gun?"
- Houston: "You will pay me my money you borrowed though."
- Where is the gun on March 28??

The next slide, captioned "Kelso's Secret Other Life," stated,

- Per DeJesus (recorded statement of March 28)
  —"You (Kelso) need to get away from these people that are doing drugs."
- Wallet had between $600-800 cash in it at the time of Kelso's murder (per Liz Forrester)
- Kelso was concerned her "drealdear" [sic] was "on his way to fightwme" [sic]

Counsel told the jury, "Mr. DeJesus, in his recorded statement on March 28, referring to a conversation he had with Ms. Kelso, he told her, 'You need to get away from these people who are doing drugs.' Mr. Houston is apparently a drug dealer who has a connection to Ms. Kelso." The State objected, and the court sustained the objection.

23

After the jury was excused, the court stated, "[B]ullet point three,[13] it would appear as though you're using that in your slide as substantive evidence, and I don't believe the text was admitted as substantive evidence." The State told the court that that bullet point was his main concern. The State continued,

> I object to the inferences he's trying to draw, that Heather Kelso is somehow a drug user by this information, as far as the $600 to $800. If that's where he's going, I don't believe that's a reasonable inference or an appropriate argument, based on the information that's been admitted, but my biggest concern is with the third bullet point.

After hearing DeJesus's argument, the court responded,

> I think the problem with the first slide is, you're using as substantive evidence a text message that was not admitted for substantive evidence.
>
> Bullet point one is okay. I don't think bullet point two is a proper inference because of the time delay. I'll let you use bullet point one with regards to that slide if you take off bullet points two and three. Those are excluded. The second slide is likewise not admissible for purposes of argument.

Defense counsel asked if he was allowed "to talk about pawning." The court stated,

> Well, you're allowed to talk about the text message, the direct quote from the text message, because that was substantive evidence. But the $600 to $800, there's such a difference -- there's such a significance in time between when that money was found that I don't think you can make a reasonable inference.

After some discussion, the court clarified,

---

13 The court appears to be referring to bullet point three, "Houston: 'You will pay me my money you borrowed though'" on the first slide captioned, "Question." That sentence, allegedly sent by Houston to Kelso, was not offered for the truth of the matter asserted but instead offered to show that the conversation happened. The text message is not in the record on review.

I think you can certainly -- there was a motion in limine with regards to Heather Kelso's alleged drug use. That was excluded. I think argument with regards to her secret life or another life, I think that encroaches on the motion in limine.

So I think you can use text messages that were admitted for the purpose of why they were admitted, and that was to the nature and extent of the investigation but not as substantive evidence. I guess I want to make sure that your argument makes that clear to the jury.

. . . .

And I think you did -- at the outset of talking to [about] Mr. Houston, you did make it clear to the jury that you're not saying he's the shooter, and I appreciate that. That's consistent with what we talked about.

Pursuant to the court's ruling, counsel changed his slides. The slide captioned "Question" kept only the bullet points, "Can you pawn your gun?" and "Where is the gun on March 28??" Counsel removed the slide captioned, "Kelso's Secret Other Life."

DeJesus contends that counsel "wanted to argue the inference that Kelso may have pawned the gun, given her expressed interest in doing so and the fact that she had $600-$800 in her wallet when she died." He asserts that the court improperly prohibited counsel from making this inference to the jury.

A text message in which Kelso asked DeJesus, "Can you pawn your gun?" had been admitted into evidence. And, the fact that Kelso had between $600 and $800 in her wallet when she died had been admitted. Also in admitted evidence was a text message sent March 31 from DeJesus to Brandon Whittaker stating, "Don't know if she sold or pawned it, man. I'm tripping out."

25

But, there is no evidence that Kelso had possession of DeJesus's gun before she died. After the shooting, DeJesus sent a text message to Whitaker saying, "I left it at Heather's house, and the police said it wasn't there." DeJesus told police that he left the gun at Kelso's house, and counsel argued this to the jury. But, there is no evidence that DeJesus left the gun there, other than his statement that he did. There is also no evidence that Kelso pawned the gun. The fact that she had $600 to $800 in cash when she died does not prove that she ever had the gun or pawned the gun. It is speculation, not a reasonable inference. Further casting doubt on the reasonableness of the inference is the fact that the Smith and Wesson gun that DeJesus owned was positively identified as the firearm likely used in the shooting. The notion that Kelso pawned the gun for $600 to $800, and that it was then purchased by someone else and used in a shooting in which she died is implausible, and highlights the unlikelihood of the inference DeJesus argues.

The trial court did not abuse its discretion in limiting defense counsel's closing argument.

IV.  Evidence of a Fabricated Kidnapping and Robbery

DeJesus argues fourth that the trial court abused its discretion in admitting evidence that, a few weeks after the shooting, he told police he had been kidnapped and robbed. He argues that the relevance of the evidence was outweighed by its prejudicial effect under ER 403 and ER 404(b). The State argues that the false report to police was a lie to implicate another person for the murder.

While this lie may constitute a bad act for purposes of ER 404(b), the State argues that it was admissible to show consciousness of guilt.

This court reviews trial court decisions to admit evidence for abuse of discretion. Perez-Valdez, 172 Wn.2d at 814. Evidence of other crimes, wrongs, or acts is inadmissible to prove character and show action in conformity therewith. ER 404(b). Such evidence may, however, be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. Evidence of "resistance to arrest, concealment, assumption of a false name, and related conduct are admissible if they allow a reasonable inference of consciousness of guilt of the charged crime." State v. Freeburg, 105 Wn. App. 492, 497-98, 20 P.3d 984 (2001). The circumstance or inference of consciousness of guilt must be substantial and real, not speculative, conjectural, or fanciful. Id. at 498.

In order for a trial court to admit evidence of past wrongs, ER 404(b) requires the trial court to (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the permissible purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect. State v. Arredondo, 188 Wn.2d 244, 256-57, 394 P.3d 348 (2017). A trial court need not specifically reference the preponderance of the evidence standard when performing an ER 404(b) analysis, so long as a finding that the standard has been met can be implied from a record clearly demonstrating as much. Id. at 258. A trial court may determine that a prior bad act probably

27

occurred based solely on the State's offer of proof. State v. Kilgore, 147 Wn.2d 288, 295, 53 P.3d 974 (2002).

On April 15, 2015, DeJesus reported to police that he had been kidnapped and robbed. In an interview two days later, he told police that a man with a gun made him drive his borrowed Jeep to an automated teller machine (ATM) and take out money. However, DeJesus gave inconsistent accounts to police of how he received the cigarette burn on his cheek during the encounter, and whether the assailant rode in his Jeep to the bank.[14] The bank's surveillance video showed that, contrary to his claim, he did not have a cigarette burn on his face before he drove to the ATM and there was no one in the backseat of his Jeep holding a gun to him at the time. When confronted with these inconsistencies, DeJesus admitted to police that he was not telling them what happened, out of fear that the robber was going to come back. In telling the police another version of the events, he attempted to tie the robbery to the murders.

DeJesus said about the alleged robber,

And then he said, "I'll be back. And don't say anything to the cops." He just wanted to know how much they knew about the murder. And I told him that I'm the only suspect. And he just laughed, "I'm smarter than you and I'm smarter than the cops."

And he said,

He just kept tellin' [sic] me that I owe him now. And he kept askin' [sic] about the murder. He said, "I'll kill, like, those kids." And - and I didn't wanna [sic] say anything 'cause [sic] he told me that you wouldn't believe me -- you guys are -- wouldn't believe me. And I - I know now that he's smarter than me.

---

[14] DeJesus concedes on appeal that he gave inconsistent accounts to police.

A. Preponderance of the Evidence

DeJesus asserts that the first defect in the trial court's admission of this prior bad act is that the court did not find that the misconduct occurred by a preponderance of the evidence. He argues that, "Although the record is clear that DeJesus lied about certain aspects of the incident (he conceded as much in the interview), it is not clear from the record that the kidnapping/robbery did not happen."

Both parties argued to the trial court on DeJesus's motion to exclude the evidence of what he reported to police. DeJesus argued that the court had to find by a preponderance of the evidence that he had lied about the robbery, filed a false report, and committed bank fraud, and that the State could not meet that burden. The State did not argue that it had to meet a different burden. The court stated,

> I'm satisfied that, as an offer of proof -- the reported robbery as an offer of proof, the prosecution will be able to at least examine in their case in chief whether or not Mr. DeJesus attempted to create another suspect for the murder he was being investigated for.
>
> I'm relying on Freeburg and Messinger[15] that's been cited in the prosecution's brief that does allow for this type of evidence under this theory. I'm not satisfied that the prejudicial effect outweighs the probative value. I am going to deny the motion and allow the prosecution to explore in their case in chief this evidence within the parameters that they've indicated.

"[W]here a trial court rules on the admissibility of ER 404(b) evidence immediately after both parties have argued the matter and the court clearly agrees with one side, an appellate court can excuse the trial court's lack of explicit findings." State v. Stein, 140 Wn. App. 43, 66, 165 P.3d 16 (2007). The trial court

---

[15] State v. Messinger, 8 Wn. App. 829, 509 P.2d 382 (1973).

29

did not explicitly state that it found by a preponderance of the evidence that DeJesus committed the misconduct. But, because no other standard was asserted, it implied as much by referring to the State's offer of proof and the case law cited by the State, which used the preponderance standard. This record is sufficient to show that the trial court found by a preponderance of the evidence that DeJesus falsely reported to police a kidnapping and robbery.

B. Consciousness of Guilt and Probative Value

DeJesus argues next that the evidence does not meet the standard for showing consciousness of guilt. He asserts that because he reported the kidnapping/robbery incident to police 18 days after the shooting, the time gap weakens the consciousness of guilt inference. DeJesus also argues that the trial court did not, on the record, carefully weigh the probative value of the evidence against its prejudicial effect, and that "any marginal probative value was outweighed by the danger of unfair prejudice to DeJesus."

In making a case for the probative value of the evidence, the State said,

> [I]t clearly shows the defendant is trying to create another suspect in this case. And he's not very good at it, and he lies about it, but it's clearly not being offered for propensity evidence. It's being offered to show that the defendant is attempting to conceal his crime by trying to create another suspect in this particular case.
>
> I think the probative value is high, given all of that, and given the defendant's own admission that he lied repeatedly to law enforcement, and his admission to other witnesses that he lied to law enforcement about portions of this apparent robbery that occurred. . . .
>
> . . . .
>
> It's the defendant who links this to the murder. It's the defendant's statements in this particular case. It should be

30

admissible. It does have sufficient probative value . . . . It certainly outweighs any unfair prejudice that may exist.

Relying on United States v. Myers, 550 F.2d 1036 (5th Cir. 1977), DeJesus argues that the 18 days between the shooting and when he reported the kidnapping/robbery is significant. In Myers, Federal Bureau of Investigation (FBI) agents attempted to contact the defendant at his home for weeks after a robbery, but were unable to do so. 550 F.2d at 1048. About three weeks after the robbery, Myers appeared to run away from a plain-clothed FBI agent, who had not identified himself, at a shopping center. Id. After that incident, and about three to six weeks after the robbery, Myers then left the state. Id. at 1050. The court reasoned that the evidence did not demonstrate intentional flight immediately after the commission or accusation of a crime. Id. Therefore, it held that it was error for the court to instruct the jury that they could infer from the incident that Myers committed the crime with which he was charged. Id. at 1051.

DeJesus's reliance on Myers is misplaced. Here, the statements were not three to six weeks after the crime, but 18 days. And, DeJesus knew he was under investigation when he made the statements. He lied when he made the statements. Importantly, unlike Myers, the State also relied on the content of DeJesus's statements themselves, which established a direct link to the murders. The timing of the statements relative to the murder did not undercut the probative value on the question of consciousness of guilt.

DeJesus argued to the trial court that the probative value was "negligible" and that it was unfairly prejudicial. The State argued that the probative value was high, and that, because it was DeJesus who linked the alleged robbery to the

murder, the probative value outweighed any unfair prejudice. The prejudice to DeJesus flows from the substance of his statements. That prejudice is not unfair merely because it was highly probative.

The court immediately ruled that the evidence would be admitted, and stated that the prejudicial effect did not outweigh the probative value. "[W]here a trial court rules on the admissibility of ER 404(b) evidence immediately after both parties have argued the matter and the court clearly agrees with one side, an appellate court can excuse the trial court's lack of explicit findings." Stein, 140 Wn. App. at 66.

The trial court did not abuse its discretion under ER 404(b) in admitting the evidence that DeJesus falsely reported to police that he was kidnapped and robbed.

V.   Cumulative Error

DeJesus argues fifth that cumulative error deprived him of his right to a fair trial.

For relief based on the cumulative error doctrine, the defendant must show that while multiple trial errors, standing alone, might not be of sufficient gravity to constitute grounds for a new trial, the combined effect of the accumulation of errors most certainly requires a new trial. State v. Clark, 187 Wn.2d 641, 649, 389 P.3d 462 (2017).

DeJesus has not shown any error. Therefore, the cumulative error doctrine does not apply. Id. at 655.

VI.   Premeditated Murder

Finally, DeJesus argues that the State failed to prove beyond a reasonable doubt that he killed Kaden with premeditation or had premeditated intent to kill Lum.   He asserts that this court must reverse his conviction for first degree murder of Kaden and his conviction for attempted first degree murder of Lum.

The State bears the burden of proving all the elements of an offense beyond a reasonable doubt.   State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).   To determine if sufficient evidence supports a conviction, we consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.   Id.   "When claiming insufficiency of the evidence, the defendant admits the truth of the State's evidence and all inferences that can reasonably be drawn therefrom."   State v. Myers, 133 Wn.2d 26, 37, 941 P.2d 110 (1997).   Circumstantial evidence provides as reliable a basis for findings as direct evidence.   Id. at 38.   This court must defer to the trier of fact on issues involving conflicting testimony, credibility of the witnesses, and the persuasiveness of the evidence.   State v. Hernandez, 85 Wn. App. 672, 675, 935 P.2d 623 (1997).   The sufficiency of the evidence is a question of constitutional law that we review de novo.   Rich, 184 Wn.2d at 903.

A person is guilty of first degree murder when "[w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person."   RCW 9A.32.030(1)(a).   "Premeditation must involve more than a moment in time; it is defined as the deliberate formation of and reflection

33

upon the intent to take a human life and involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." State v. Hoffman, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991) (footnotes omitted). Premeditation can be proved by circumstantial evidence where the inferences drawn by the jury are reasonable and the evidence supporting the jury's verdict is substantial. Id. at 83. There are four characteristics or factors that are particularly relevant to establish premeditation: motive, procurement of a weapon, stealth, and the method of killing. State v. Hummel, 196 Wn. App. 329, 355, 383 P.3d 592 (2016).

DeJesus argues that, looking at the evidence in the light most favorable to the State, DeJesus had a motive to kill Kelso, but did not have a motive to kill Kaden or Lum.[16] He asserts that, in the light most favorable to the State, he brought a gun to the home to kill Kelso, not to kill Lum and her son.

To convict for attempted first degree murder, the State needed to prove intent to commit first degree murder with premeditation and a substantial step towards the commission of that crime. RCW 9A.32.030(1)(a); RCW 9A.28.020(1). The State argues that DeJesus knew other people besides Kelso were in the home. It argues that DeJesus waited until Kelso went onto the back porch before he began shooting, and that, if he intended to kill only Kelso, it would have made more sense for him to flee after he shot her. The State contends that, "It is clear from the circumstantial evidence presented in this case that DeJesus intended to

---

[16] DeJesus does not argue that the evidence was insufficient to support his conviction for first degree attempted murder of Dean.

kill all the residents or possible witnesses based on his actions inside the residence." The State cites State v. Condon, 182 Wn.2d 307, 343 P.3d 357 (2015).

In Condon, the State presented evidence that the defendant entered the home "wielding a loaded handgun and intending to commit a robbery." Id. at 315. Our State Supreme Court reasoned that, given that he entered the house with a loaded gun, intending to rob a drug dealer, a rational jury could have found premeditation. Id.

In State v. Price, 103 Wn. App. 845, 851, 14 P.3d 841 (2000), the defendant argued that, because he fired one shot into a vehicle, his actions could not constitute a substantial step toward the commission of first degree murder for two victims. This court reasoned that the "act of deliberately firing a gun toward an intended victim is 'strongly corroborative' of an attempt to commit first degree murder." Id. at 853 (quoting State v. Vangerpen, 125 Wn.2d 782, 796, 888 P.2d 1177 (1995)). And, it highlighted that RCW 9A.32.030 does not require specific intent to kill a specific victim. Id. And, it stated that "neither does the fact that Price may have thought that the car was occupied only by the driver prevent him from possessing the requisite intent as to the passenger." Id. It held that a reasonable jury could have found that firing a single bullet into a vehicle with two people sufficiently corroborated that Price took a substantial step toward commission of first degree murder for both victims. Id. at 852.

In Hummel, this court held that the evidence was insufficient to find that Hummel killed his wife Alice with premeditated intent to commit murder in the first degree. 196 Wn. App. at 332, 358-59. The court stated, "The evidence that

Hummel disposed of her body, concealed her death, and fraudulently obtained her disability checks after she died is evidence of guilt but does not prove premeditation." Id. at 356-57. It found that the State did not present evidence of motive, planning, the circumstances or the method and manner of death, or the deliberate formation of the intent to kill Alice beforehand. Id. at 358.

DeJesus argues here, "The method was a single shot in the dark. Unlike with Kelso and Dean, he fired once toward Lum, accidentally killing [Kaden] in the process." He asserts that, because there are no multiple acts of violence perpetrated against Lum and Kaden, it does not support premeditation.

This case differs from Hummel. The State presented evidence that DeJesus shot Kelso while she was standing on the back porch, and then DeJesus entered the home and fired multiple shots. Lum testified that, while she was still in her bed, she heard Kelso say, without "rais[ing] her voice hardly" that she had been shot. Lum heard more gunshots and heard Dean ask her for help. Lum then got out of her bed and covered her son on the ground. While she was on the floor, she heard "a lot of gunshots." Then, she heard someone she thought was Dean come through her room and ask her for help or to call 911. After she heard the window shatter, Lum testified that "somebody opened up the door again, [and] shot towards me and Kaden." She felt the bullet go by her face, and pretended to be dead.

In the light most favorable to the State, the evidence shows that DeJesus went to the home to shoot Kelso. The State presented evidence of motive and planning. After shooting Kelso, DeJesus entered the home with a loaded gun, shot

Kelso again, and pursued and shot Dean as he ran through the home. These circumstances show a premeditated intent to kill not only Kelso, but the other occupants of the home, as well. DeJesus then deliberately shot at Lum while she was holding Kaden on the ground. The jury could have concluded that, when DeJesus ran into the dark bedroom pursuing Dean, he thought that the person huddled on the floor was Dean. The intent is transferred. It is immaterial if he thought it was Dean, when really it was Lum, or the fact that he fired only once at two victims. The statutory definition of first degree murder does not require specific intent for a specific victim.

Under the reasoning of Condon and Price, a reasonable jury could have found the essential elements of first degree premeditated murder as to Kaden and attempted first degree premeditated murder as to Lum.

We affirm.

WE CONCUR:

37