IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

               Respondent,

       v.

RICHARD NANDO PHILLIPS,

               Appellant.

No. 85658-8-I

DIVISION ONE

UNPUBLISHED OPINION

HAZELRIGG, C.J. — Richard Phillips appeals from the judgment and sentence entered on a jury's verdict convicting him of one count of drive-by shooting and one count of unlawful possession of a firearm in the first degree (UPF1). He asserts that the State did not present sufficient evidence of one element of his drive-by shooting conviction, the trial court erred by denying his requests to exclude ballistics identification evidence pursuant to *Frye v. United States*[1] and ER 702, and his UPF1 conviction, predicated on his prior conviction of a violent felony, was an unconstitutional permanent deprivation of his right to bear arms under the Second Amendment to the United States Constitution. Phillips does not establish entitlement to appellate relief on any of his challenges. Accordingly, we affirm.

---

[1] 54 U.S. App. D.C. 46, 293 F. 1013 (1923).

FACTS

On the evening of October 2, 2022, in a span of less than three minutes, four individuals along a short section of 240th Street SW in Edmonds east of Highway 99 each dialed 911 to report a gunshot-related incident.[2] One individual reported to the emergency dispatcher that a bullet had passed through the southern exterior wall of her motel room and lodged itself into the molding of the doorframe on the opposite interior wall. The other three individuals lived either on or near 240th Street SW to the east of the motel. Each reported that they heard the sound of multiple gunshots (between eight and fifteen) and, shortly thereafter, saw a large yellow or orange moving truck travel eastward at high speed along 240th Street SW.

In an amended affidavit of probable cause (PC affidavit) filed by a deputy prosecuting attorney in March 2023, the State described the 911 calls as follows:

> Linda White reported that she was staying at the K and E Motor Inn at 23921 Highway 99 in room 205 and that someone just shot through the wall of the unit she was in. . . .White said that bullet came though the wall near the dance studio parking lot and the bullet went into the molding on the door frame on the opposite wall.
>
> Shawna Svenkerud reported that she was at her home . . . in Edmonds when she heard about 12 shots and then a yellow moving truck just flew down the road and it looked like the passenger door was wide open. . . . Svenkerud explained the road the yellow moving truck was driving down was 240th St SW and it was heading east away from Highway 99.
>
> Sandi Hamilton reported that she was at her home . . . in Edmonds and that she had just heard 8 gun shots right up the street from her house. . . . Hamilton reported after the gun shots one of the moving trucks from just up the street screeched down her street. . . . Hamilton stated the moving truck was going east on 240th St SW. . . . Hamilton stated the truck was a big yellow or orange truck.

_____

[2] The 911 calls occurred between 6:55:52 p.m. and 6:58:17 p.m.

[A person who only identified herself to police as] Michelle reported that she was at her home . . . in Edmonds. Michelle reported that just two seconds ago she heard 15 shots and it sounded like a gun. Michelle said after she heard the shots a big yellow or orange delivery truck went speeding down the residential road like crazy. Michelle reported the truck went east down 240th and that she had never seen a truck move that fast.

One minute after the first 911 call was made, law enforcement officers from the Edmonds and Mountlake Terrace Police Departments (EPD and MTPD, respectively) responded to the resulting emergency dispatch and headed toward the K&E Motor Inn. Several officers arrived shortly thereafter and initiated an investigation. According to the March 2023 PC affidavit,

[EPD] Officer Erik Sanchez located multiple shell casings in roadway on 240 St SW near the 8100 block of that street. Specifically, Officer Sanchez located three 10 mm shell casings on the south side of 240 St SW in the 8100 block. Two of those casings were in the roadway and another was in the grass near the roadway. Officer Sanchez located three more 10 mm shell casings in the brush line on the southside of 240 St SW. Office Sanchez also located one live 10 mm round on the pavement just south of 240 St SW on the area connecting to the parking lot of Careful Movers located at 24111 Highway 99, Suite 303. Officers located a bullet hole in the exterior south facing wall of Linda White's bathroom in unit 205 at the K and E Motor Inn. Officers also located a second bullet hole in the wall opposite [the] south wall of Linda White's unit. That bullet hole was in the molding on a door frame. The bullet was so deeply lodged in the wall that officers were unable to retrieve it.

While the Officers were at the K and E Motor Inn and in the area around it speaking to potential witnesses[,] Sandi Hamilton provided a written statement further describing what she had observed. Sandi Hamilton's statement stated "Heard 8 gunshots and then one of the orange 'moving trucks' from behind Burlington Coat Factory racing down 240th Street. Fairly immediately after the gunshots—less than 30 sec.[,] then called 911."

Meanwhile, nearly four minutes after the first 911 call,

[MTPD] Sergeant Jeremy Perry observed a large yellow moving truck heading eastbound on 236th St SW and Interstate 5, approximately two miles away from 23921 Highway 99 Edmonds, WA 98026. Sergeant Perry observed the yellow truck was only occupied by a single male driver and began to follow it in his patrol vehicle. Sergeant Perry observed the yellow moving truck turn north bound on 48th Ave W from 236th St SW. While the yellow moving truck was driving north on 48th Ave W[,] it drove over the yellow center line and into the oncoming left turn lane with both its driver's side tires. Sergeant Perry conducted a traffic stop of that large yellow moving truck[,] which then pulled into the yard of a church located at 4700 228th St SW in Mountlake Terrace. With the assistance of other responding officers[,] Sergeant Perry arrested the sole occupant of that vehicle who was later identified as the Defendant, Richard Phillips.

After the Defendant was in custody[,] Sergeant Perry observed an empty bottle of R&R Whiskey on the floorboard of the yellow moving truck where the Defendant had been sitting. That empty bottle of whiskey was in open view and could be observed from outside the yellow moving truck. Sergeant Perry also observed a black semi-automatic handgun on the seat next to where the Defendant had been seated. That handgun was also in open view and could be observed from outside the yellow moving truck.

A search warrant was later obtained for the yellow moving truck and[,] during the execution of that search warrant[,] a 10 mm handgun was found in the yellow box truck right next to where the Defendant had been seated while he was driving the yellow box truck. [EPD] Detectives also located a wallet on the passenger seat of the yellow moving truck that contained an ID Card and several credit can [sic] debit cards with Richard Phillips['] name on them.

A review of the Defendant's criminal history in the Judicial Access Database System . . . shows that the defendant has a 1996 conviction for Second Degree Assault under King County cause number 96-1-03270-7.

On October 20, 2022, the State charged Phillips with one count of unlawful possession of a firearm in the first degree, a class B felony;[3] one count of reckless endangerment, a gross misdemeanor; one count of aiming or discharging a

---

[3] RCW 9.41.040(1)(b).

firearm, a gross misdemeanor; and one count of driving under the influence (DUI), a gross misdemeanor. The UPF1 charge was predicated on Phillips' September 1996 conviction of assault in the second degree, itself a class B felony and a "serious offense" under RCW 9.41.010 for the purpose of the degree of the UPF offense.

Thereafter, according to the March 2023 amended PC affidavit, the following occurred:

> On November 29, 2022, [EPD] Detective Patrick Clark test[-]fired the 10 mm semi-automatic handgun seized from the yellow moving truck the Defendant had been driving on October 2, 2022. Detective Clark was able to successfully test fire the handgun twice.
>
> On February 9, 2023, Detective Patrick Clark again test[-]fired the 10 mm semi-automatic handgun seized from the yellow moving truck the Defendant had been driving on October 2, 2022. This time[,] Detective Clark test fired that handgun three times and kept the three spent shell casings from those test firings. Those three shell casings were sent into the Washington State Patrol Crime Lab for firearm tool mark analysis and comparison along with three other shell casings that had been located near the K and E Motor Inn on 240th St SW on October 2, 2022.
>
> On March 16, 2023, State Forensic Scientist Dijana Coric conducted firearm tool mark analysis and comparison[4] on the three shells casings taken from the scene of the alleged shooting that took place near the K and E Motor Inn on 240th St SW on October 2, 2022, with the three shell casings test fired from the 10 mm semi-automatic handgun seized from the yellow moving truck the Defendant had been driving on October 2, 2022. [Coric's] results and conclusions as outlined in her Crime Laboratory Report were that the three shell casings taken from the scene of the alleged shooting on 240th St SW were identified as having been fired from the same firearm that fired the three shells that were test fired by Detective Clark on February 9, 2023.

---

[4] Coric testified that she relied on the Association of Firearm and Tool Mark Examiners methodology of ballistics identification in order to form her opinion.

On March 31, 2023, relying on the amended PC affidavit, the State filed a first amended information that charged Phillips with one count of UPF1, one count of drive-by shooting, a class B felony,[5] and one count of DUI.

Prior to trial, Phillips requested a *Frye* hearing to challenge the Association of Firearm and Tool Mark Examiners (AFTE) methodology of ballistics identification underlying Coric's report. This was necessary, he argued, "[b]ecause recent developments in the field continue to erode the scientific basis for toolmark pattern comparison and firearm identification." He also sought to exclude or limit Coric's ballistics identification testimony pursuant to ER 702.

The State opposed Phillips' motions and contended that no *Frye* hearing was required and Coric's testimony satisfied the requirements of ER 702 in light of her qualifications and the helpfulness of her testimony to the jury. The trial court reserved ruling on Phillips' motions until later in the trial.

Phillips' six-day jury trial commenced the following day. After opening statements, and continuing into the fourth day of trial, the State called one public records officer and eleven law enforcement officers to testify and presented numerous exhibits, including recordings of the 911 calls and investigative photographs, many of which the court admitted.

On the morning of the fourth day of trial, the day before Coric was set to testify, the court held a hearing on Phillips' ballistics identification motions. After reviewing the parties' written materials and receiving their arguments, the court denied Phillips' motions. The court ruled that a *Frye* hearing was not required

---

[5] RCW 9A.36.045(3).

regarding the AFTE methodology because this court had recently rejected a similar challenge to the AFTE methodology in *State v. DeJesus*[6] and because Phillips had not presented persuasive argument in support of departing therefrom. The court also ruled that the State was authorized to present Coric to testify as an expert, "not about probability but that in her opinion a particular firearm fired a particular bullet[,] by resorting to the [AFTE] theory," and that "in her opinion, based on what she has learned, what she has experienced, firearms do leave unique marks on bullets and casings depending on the firearm."

The State then called Coric to testify and elicited her opinion that the "unknown" shell casings that she was asked to examine matched the casings test-fired from the 10-millimeter handgun seized from the yellow moving truck. The "unknown" shell casings were those discovered on 240th Street SW on the night in question. The State rested its case at the close of Coric's testimony.[7]

Phillips rested his case-in-chief shortly thereafter without presenting witnesses. On July 19, the jury returned a verdict acquitting Phillips of the DUI charge and convicting him of the UPF1 and drive-by shooting charges. The court imposed 30 months in prison on his UPF1 conviction and 36 months on his drive-by shooting conviction, to be run concurrently, followed by 18 months of community custody upon his release from prison.

Phillips timely appealed.[8]

---

[6] *State v. DeJesus*, 7 Wn. App. 2d 849, 859-65, 436 P.3d 834 (2019).

[7] Phillips then moved to dismiss the charges against him on the basis of insufficient evidence, which the court denied.

[8] Both Phillips and the State filed a notice of appeal. The State, however, withdrew its cross appeal on October 24, 2024.

ANALYSIS

I.      Sufficiency of the Evidence as to the Drive-By Shooting Conviction

Phillips first asserts that the State did not present sufficient evidence to support the jury's conviction of drive-by shooting. This is so, Phillips contends, because insufficient evidence was adduced to support a conclusion beyond a reasonable doubt that the moving truck in question was the motor vehicle used to transport him and the 10-millimeter firearm to the scene of the discharge and he discharged such firearm from inside, or in the immediate area, of that moving truck. The State responds that ample circumstantial evidence, and reasonable inferences drawn in its favor therefrom, was presented at trial to support that Phillips drove the yellow moving truck to the scene of the discharge and he was within the truck, or in its immediate area, at the time the firearm in question was discharged. The State is correct.

We review a challenge to the sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). In so doing,

> "we view the evidence in the light most favorable to the prosecution and ask whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wentz*, 149 Wn.2d 342, 347, 68 P.3d 282 (2003). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010); *see also State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (the evidence is "interpreted most strongly against the defendant"). This court defers to the finder of fact on issues of witness credibility, persuasiveness, and conflicting testimony. *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011). Circumstantial and direct evidence are equally reliable. *State v. Lazcano*, 188 Wn. App. 338, 363, 354 P.3d 233 (2015).

- 8 -

*State v. Roberts*, 32 Wn. App. 2d 571, 584, 553 P.3d 1122 (2024), *aff'd*, No. 103546-2 (Wash. July 31, 2025), https://www.courts.wa.gov/opinions/pdf/1035462.pdf. Given that a defendant's claim of evidentiary insufficiency admits all reasonable inferences that *can* be drawn from the evidence adduced at trial, an inference supporting the conviction need not be the only one that could be drawn from the evidence at issue. Rather, the inference must merely be one that is reasonably drawn from such evidence, rather than based on speculation. *State v. Yusuf*, 21 Wn. App. 2d 960, 966, 512 P.3d 915 (2022). Notably, in making findings, a fact finder "may rely upon common sense and the 'common experience of mankind.'" *State v. Welker*, 37 Wn. App. 628, 638 n.2, 683 P.2d 1110 (1984).

The State charged Phillips with one count of drive-by shooting pursuant to RCW 9A.36.045. The trial court instructed the jury, in pertinent part, as follows:

INSTRUCTION NO. 4

The evidence that has been presented to you may be either direct or circumstantial. The term "direct evidence" refers to evidence that is given by a witness who has directly perceived something at issue in this case. The term "circumstantial evidence" refers to evidence from which, based on your common sense and experience, you may reasonably infer something that is at issue in this case.
The law does not distinguish between direct and circumstantial evidence in terms of their weight or value in finding the facts in this case. One is not necessarily more or less valuable than the other.
. . . .

INSTRUCTION NO. 15

A person commits the crime of Drive-By Shooting when [they] recklessly discharge[] a firearm in a manner that creates a substantial risk of death or serious physical injury to another person and the discharge is either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter or the firearm to the scene of the discharge.

INSTRUCTION NO. 16

To convict the defendant of the crime of Drive-By Shooting, as charged in Count 2, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about October 2, 2022; the defendant recklessly discharged a firearm;

(2) That the discharge created a substantial risk of death or serious physical injury to another person;

(3) *That the discharge was either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter or the firearm to the scene of the discharge*; and

(4) That this act occurred in Snohomish County, Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if after weighing all the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

. . . .

INSTRUCTION NO. 18

In deciding your verdict, you should consider that "immediate area means within a few feet or yards."

(Emphasis added) (boldface omitted).

The State's theory of the case at trial was that Phillips had driven the yellow moving truck to the scene of the discharge and, "based on the inferences in this case and the facts and the timing of everything[,] Mr. Phillips had to have been in that truck or basically right next to it to fire off those shots, to jump in, and then be screaming down that road away from the scene."

On appeal, Phillips does not dispute whether sufficient evidence was presented to the jury regarding the first, second, and fourth elements of drive-by shooting as provided in jury instruction No. 16, the "to convict" instruction for the offense. Instead, he contends that the State failed to adduce sufficient evidence

- 10 -

of the third element: "That the discharge was either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter or the firearm to the scene of the discharge." We consider each component of this element separately.

A.    Scene of the Discharge

At trial, the State sought to establish that the scene of the discharge was the short section of roadway on 240th Street SW between the parking lot of Careful Movers to the south and the K&E Motor Inn across another parking lot to the north. Phillips does not dispute that the State presented sufficient evidence to establish this portion of the roadway as the scene of the discharge. This unchallenged portion of the third element was supported by testimony and exhibits of 911 audio recordings of individuals indicating that they resided to the east of a section of roadway on 240th Street SW and, on the evening in question, heard the sound of multiple gunshots to the west. The State also presented a 911 audio recording of an individual residing at the K&E Motor Inn, due north of the section of roadway at issue, who called 911 to report that a bullet had passed through the southern exterior wall of her motel room and lodged itself in the opposite wall to the north.

The State also offered testimony from EPD Officer Melinda Leen and former[9] EPD Officer Ashley Saunders, along with supportive exhibits, establishing that the south-facing exterior wall of the motel room had two bullet holes and the presence of a bullet hole in a doorframe on the opposing interior wall to the north. In addition, the State presented Sanchez's testimony explaining that six 10-

_____
[9] At the time of trial, Saunders was working on behalf of the Bellevue Police Department.

millimeter shell casings and an unfired 10-millimeter bullet round, all imprinted with "Ammo Inc.," were found on or adjacent to the southern section of roadway between the Careful Movers parking lot to the south and the K&E Motor Inn to the north.[10] Sanchez also testified that if a vehicle were to head eastbound legally on 240th Street SW, it would be traveling on the south side of that street. He further explained that the roadway on that street was higher in the middle than on its sides and, when a firearm discharges a bullet from its shell casing, the firearm ejects that casing off to the side, to the left or to the right.

Taken together, the trial record in this matter contains ample evidence to support that the scene of the discharge was the short section of roadway on 240th Street SW between the parking lot of Careful Movers and the K&E Motor Inn.

B.    Motor Vehicle Used to Transport Shooter or Firearm to Scene of the Discharge

The State also had the burden to establish beyond a reasonable doubt that the vehicle in which Phillips drove both himself and the 10-millimeter firearm to the scene of the discharge was the same yellow moving truck in which he was observed minutes after the gunfire. In support of this, the State introduced testimony and 911 audio recordings of several eyewitnesses who live near the scene of the discharge indicating that shortly after hearing the sound of gunshots, they observed a large yellow or orange moving truck traveling at high speed eastward on 240th Street SW, away from the scene. The State also offered

_____

[10] Another police officer testified that she canvassed the area around the motel and the Careful Movers parking lot across the street but did not locate any additional shell casings, bullets, or firearms.

testimony from law enforcement officers, including Perry, former[11] Brier Police Department Officer Gabrielle Munn, and MTPD Officer Eugene Shin, stating that Phillips was the sole occupant of a yellow moving truck that matched the description of the moving truck in question in a location relatively nearby, minutes after the gunshots were reported.[12] Additional law enforcement officer testimony, including that by Perry and EPD Detective Robert Allen, specified that the truck's cabin contained a key inserted in the ignition and a wallet that held Phillips' driver's license and other documents bearing his name.

The State also presented testimony from Sanchez and one eyewitness indicating that the yellow moving truck appeared to be from a moving company that had a parking lot adjacent to the scene of the discharge that contained similar large yellow moving trucks. Sanchez's testimony further illustrated that the Careful Movers parking lot was connected to 240th Street SW, attempting to turn from the Careful Movers parking lot onto 240th Street SW would be a "kind of narrow" turn in general and it would be a "difficult" turn for a large moving truck to make. Lastly, the State offered the testimony of Perry, Allen, and EPD Officer Rheshaun Strange, along with exhibits of investigative photographs, indicating that the yellow moving truck in Phillips' control matched the description of the truck seen leaving the scene shortly after the discharges in question. The testimony and exhibits further showed that a 10-millimeter firearm was located within the passenger cabin

---

[11] Munn was employed as a marshal with the Snohomish County Sheriff's Department by the time of trial.

[12] The State also presented law enforcement officer testimony that despite responding to the emergency dispatch and converging on K&E Motor Inn from different directions, they did not observe any large yellow moving trucks.

of the truck, which matched the caliber of the bullet casings found at the scene of the discharge.

Taking the evidence in the light most favorable to the State, including all reasonable inferences therefrom, the State presented sufficient evidence to establish that the yellow moving truck was the vehicle used to transport Phillips and the 10-millimeter firearm to the scene of the discharge. For instance, presuming that the jury credited the foregoing testimony and exhibits, if the truck was seen traveling away *from* the scene of the discharge, it would be reasonable, and a matter of common sense, to infer that the truck had traveled *to* the scene of the discharge. Similarly, if Phillips was identified as the sole occupant of the yellow moving truck shortly after the gunfire reported by the callers and if he had control over the yellow moving truck, it is reasonable to infer that Phillips had driven the truck away from the scene of the discharge, which, in turn, supports the conclusion that he had driven it to that location.

Furthermore, given the proximity of a moving company with similar moving trucks immediately adjacent to, and accessible from, the scene of the discharge, it is a reasonable inference that Phillips had driven the truck from the moving company's parking lot to the scene of the discharge. Finally, the discovery of a 10-millimeter pistol in the passenger cabin of the moving truck that was under Phillips' control shortly after the reported firearm discharges, when considered alongside the discovery of 10-millimeter shell casings at the scene of the discharge, supports a rational inference that the firearm was located within the truck *after* the reported gunfire, which in turn supports an inference that the firearm

was located in the truck *before* those discharges. Therefore, given all the evidence and reasonable inferences drawn therefrom in the State's favor, the State presented sufficient evidence to support the jury's determination that the yellow moving truck stopped by Perry while under Phillips' exclusive control was the vehicle that transported Phillips and the 10-millimeter firearm to the scene of the discharge.

> C. Discharge Was Either from a Motor Vehicle or from the Immediate Area of a Motor Vehicle

In order to convict Phillips of the crime of drive-by shooting, the State was also required to establish that he either fired the 10-millimeter handgun from inside of the passenger cabin of the yellow moving truck or within a few feet or yards of it. To meet its burden, the State presented the testimony of Strange, Perry, and Allen, along with exhibits of photographs, indicating that a 10-millimeter firearm was observed inside the moving truck's passenger cabin to the right side of the driver's seat buckle, the firearm was seen in that location after Phillips was seen driving and having control over the moving truck, and there were no unfired rounds remaining in the handgun's magazine or in its chamber. As set out in Section I.A *supra*, the State also introduced Sanchez's testimony that he discovered multiple 10-millimeter casings in the southern section of roadway between the Careful Movers parking lot and the K&E motel, the roadway itself was higher in the middle than it was on the sides and, when a firearm discharges a bullet from its shell casing, the casing is ejected off to one side of the firearm.

The State offered the testimony of EPD Detective Patrick Clark, who explained that he test-fired the 10-millimeter handgun both to ensure that it was a functioning firearm and to produce test shell casings for comparison purposes and that a 10-millimeter caliber firearm is not a commonly found firearm caliber. The State also presented Coric's testimony opining, in effect, that the 10-millimeter casings located at the scene of the discharge matched the 10-millimeter casings test-fired from the 10-millimeter firearm recovered from the yellow moving truck under Phillips' control minutes after the firearm discharges in question. As explained in Section I.B *supra*, the State presented evidence describing the difficulty of maneuvering a moving truck from the Careful Movers parking lot exit onto the 240th Street SW roadway. Additionally, also set out in Section I.B *supra*, the State presented testimony of eyewitnesses and an exhibit of 911 audio recordings indicating that within a few blocks of the scene of the discharge and less than 30 seconds after the sound of gunshots was heard, the yellow moving truck was seen traveling at a high speed.

The State presented sufficient evidence to establish beyond a reasonable doubt that Phillips discharged the 10-millimeter firearm seized from the yellow moving truck pursuant to the search warrant from either inside or within a few feet or yards of the truck. The foregoing evidence supports reasonable inferences that (1) the moving truck was facing eastward the time of the discharge and either parked, or stopped, at the scene of the discharge on 240th Street SW; (2) a firearm was discharged at the scene from either the southern section of roadway itself or from the middle of the roadway; (3) Phillips either fired the handgun from inside

the truck cabin and placed it to his right side, or he fired it from outside of the cabin, entered the cabin, and then placed it to his right side; (4) he was either immediately nearby or in the truck at the time that the gunshots in question were fired; and (5) the firearm later found in the truck was the same one that was discharged toward the K&E Motor Inn.[13] Considering all of the evidence and inferences together, a reasonable jury could conclude that with the yellow moving truck parked eastward on 240th Street SW at the scene of the discharge, Phillips fired the 10-millimeter handgun that was later seized from the truck either while he was outside of the truck on the southern side of 240th Street SW, with the ejected casings falling to the ground around him and rolling to the road's southern side and nearby grass, or while inside of the truck, with the ejected casings falling from the driver's side window in the middle of the road and rolling to the road's southern side and nearby grass. Thus, the State presented sufficient evidence to support the jury's conviction of drive-by shooting with regard to the challenged element in that crime's "to convict" instruction. Accordingly, Phillips' assertion of evidentiary insufficiency fails.

II.     Admission of Ballistics Identification Evidence and Coric's Testimony

Phillips next asserts that the trial court erred when it denied his motion for a *Frye* hearing regarding the AFTE methodology of ballistics identification and

---

[13] The State also introduced evidence indicating that the truck's exterior driver's side door was inoperable. From this, it is reasonable to infer that if Phillips fired the handgun from outside of the truck, it is consistent with Phillips entering and exiting through the functioning passenger side door or, in the alternative, consistent with Phillips exiting from the driver's side of the truck, which he did when he was later stopped by Perry, and leaving the driver's side door open for his reentry after discharging the firearm.

denied his motion to suppress or limit Coric's ballistics identification expert testimony pursuant to ER 702. The trial court did not err.

A. Request for *Frye* Hearing on AFTE Methodology

Phillips first contends that the trial court erred when it denied his motion for a *Frye* hearing to challenge the AFTE methodology of ballistics identification. In that motion, Phillips argued that "recent developments" in the relevant scientific community suggest that the AFTE methodology is no longer generally accepted therein. Phillips does not establish an entitlement to appellate relief.

We use the *Frye* test to evaluate scientific evidence for its admissibility in a court of law. *State v. Gregory*, 158 Wn.2d 759, 829, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). Under *Frye*, scientific evidence is not admissible unless "[b]oth the scientific theory underlying the evidence and the technique or methodology used to implement it" are generally accepted in the relevant scientific community. *Id.* Although scientific opinion need not be unanimous, the evidence may not be admitted if there is a significant dispute among qualified scientists in the relevant community. *Id.* Notably, once a particular methodology has been generally accepted in the community, "application of the science to a particular case is a matter of weight and admissibility under ER 702." *Id.*

We review a trial court's determination as to whether to hold a *Frye* hearing de novo. *Id.* at 830. Our Supreme Court has remarked that

> [o]nce this court has made a determination that the *Frye* test is met as to a specific novel scientific theory or principle, *trial courts can generally rely upon that determination as settling such theory's*

> *admissibility in future cases*. However, trial courts must still undertake the *Frye* analysis if one party produces new evidence which seriously questions the continued general acceptance or lack of acceptance as to that theory within the relevant scientific community.

*State v. Cauthron*, 120 Wn.2d 879, 888 n.3, 846 P.2d 502 (1993) (emphasis added), *overruled in part on other grounds by State v. Buckner*, 133 Wn.2d 63, 941 P.2d 667 (1997). Six years ago, we recognized that the AFTE ballistics identification methodology meets the *Frye* test in *State v. DeJesus*, 7 Wn. App. 2d 849, 436 P.3d 834 (2019).

Nevertheless, Phillips argued at trial, and reiterates on appeal, that the trial court was required to undertake a *Frye* analysis because of recent developments that, he avers, seriously questioned either the general acceptance or lack of acceptance as to the AFTE theory within the relevant scientific community. In so arguing, Phillips relied on the National Research Council of the National Academy of Sciences (NAS) reports from 2008 and 2009[14] as well as the President's Council of Advisors on Science and Technology (PCAST) report from 2016.[15]

However, the foregoing argument and evidence are identical to that which we considered and rejected in *DeJesus*. There, the challenged scientific evidence stemmed from a Washington State Patrol Crime Laboratory analyst's comparison of two spent shell casings and that analyst's conclusion that the casings were fired

---

[14] COMM. TO ASSESS THE FEASIBILITY, ACCURACY, & TECH. CAPABILITY OF A NAT'L BALLISTICS DATABASE, NAT'L RESEARCH COUNCIL, BALLISTIC IMAGING (2008), www.nap.edu/read/12162/chapter/1 [https://perma.cc/37GE-4S4C]; COMM. ON IDENTIFYING THE NEEDS OF THE FORENSIC SCI. CMTY. ET AL., NAT'L RSCH. COUNCIL, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (2009), www.nap.edu/read/12589/chapter/1 [https://perma.cc/3GXP-RCFR].

[15] PRESIDENT'S COUNCIL OF ADVISORS ON SCI. AND TECH., EXEC. OFFICE OF THE PRESIDENT, FORENSIC SCIENCE IN CRIMINAL COURTS: ENSURING SCIENTIFIC VALIDITY OF FEATURE COMPARISON METHODS (Sept. 2016), https://www.broadinstitute.org/files/sections/about/PCAST/2016%20pcast-forensic-science.pdf [https://perma.cc/B6G9-EBPX].

from the same gun. *Id.* at 858. DeJesus argued that there was a "significant dispute among qualified scientists in the relevant scientific community about the validity of ballistic identification methodology." *Id.* at 860. He cited the 2008 and 2009 NAS reports and the 2016 PCAST report in support of his argument. *Id.* at 861. We rejected his contention, holding that

> the reports on which DeJesus relies do not affect the general scientific acceptance of ballistic identification. Instead, the problems they espouse bear on the question of reliability of the individual test and tester at issue. These questions are then considered by the trier of fact in assessing the weight to be given the evidence.

*Id.* at 863-64.[16]

Because *DeJesus* considered the same challenges to the validity of the evidence as Phillips presents on appeal, we continue to adhere the previous judicial determination that this method of ballistics identification satisfies the *Frye* test.[17] Thus, Phillips' assertion fails. He nevertheless contends that

---

[16] In 2019, we looked to other jurisdictions and concluded that "[c]ourts from around the country have universally held that toolmark analysis is generally accepted." *DeJesus*, 7 Wn. App. 2d at 865. Since then, other jurisdictions applying the test announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), have questioned the general acceptance of the AFTE methodology. *See, e.g.*, *Abruquah v. State*, 483 Md. 637, 692, 296 A.3d 961 (2023) (determining "general acceptance" factor regarding AFTE ballistics identification methodology is "neutral" under *Daubert*); *United States v. Briscoe*, 703 F. Supp. 3d 1288, 1307-08 (D.N.M. 2023) (determining that scientific criticism of ballistics identification does not establish general acceptance in the relevant scientific community under *Daubert*); *United States v. Cloud*, 576 F. Supp. 3d 827, 844-45 (E.D. Wash. 2021) (determining that the "general acceptance" factor weighs "slightly" against admitting ballistics identification evidence under *Daubert*); *United States v. Adams*, 444 F. Supp. 3d 1248, 1266 (D. Or. 2020) (explaining, pursuant to *Daubert*, "where the scientific community at large disavows the theory because it does not meet the parameters of science, [the court] cannot find that the AFTE method enjoys 'general acceptance' in the scientific community"); *United States v. Shipp*, 422 F. Supp. 3d 762, 783 (E.D.N.Y. 2019) (determining, under *Daubert* reliability analysis, that AFTE theory "has not achieved general acceptance in the relevant community").

However, this authority from other jurisdictions is not controlling, and our Supreme Court has rejected the *Daubert* test and adhered to the *Frye* test for the purpose of determining the admissibility of scientific evidence. *State v. Copeland*, 130 Wn.2d 244, 251, 922 P.2d 1304 (1996). Thus, these cases do not guide our analysis.

[17] Since we issued our decision in *DeJesus*, we have not been persuaded to depart from the reasoning set forth therein. *See, e.g.*, *State v. Kime*, No. 79439-6-I (Wash. Ct. App. Aug. 30, 2021)

> [t]he panel in *DeJesus* did not say the scientific community agreed that the [AFTE] methodology supports an unqualified match of a specific firearm to specific cartridges. To the extent *DeJesus* implied otherwise, this [c]ourt can and should chart its own course. *See State v. Miller*, [30] Wn. App. 2d [461], 545 P.3d 388, 392 (2024) ("[I]f we conclude one of our prior opinions was incorrect, we are free to depart from it.").

(One alteration in original.)

We decline his invitation. Phillips does not provide citation to *DeJesus* in support of his proposed interpretation of that case nor does he provide argument in support of establishing that our holding in *DeJesus* is favorable to his appeal in this matter. We do not consider assertions unsupported by argument and citation to legal authority. *See* RAP 10.3(a)(6).

Thus, Phillips does not establish that a *Frye* hearing was required for the purpose of determining the admissibility of evidence arising from the AFTE methodology of ballistics identification. Accordingly, the trial court did not err when it denied Phillips' request.

B.      Request to Exclude Coric's Testimony under ER 702

Phillips next asserts that the trial court erred when it denied his motion to limit or exclude Coric's ballistics identification testimony pursuant to ER 702. He

---

(unpublished), https://www.courts.wa.gov/opinions/pdf/794396.pdf; *State v. Beal*, No. 39574-0-III (Wash. Ct. App. July 9, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/395740_unp.pdf; *In re Pers. Restraint of Curry*, No. 54033-9-II (Wash. Ct. App. June 15, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054033-9-II%20Unpublished%20Opinion.pdf; *State v. Hatfield*, No. 77512-0-I (Wash. Ct. App. Dec. 2, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/775120.pdf. The unpublished opinions cited here are provided pursuant to GR 14.1 solely to illustrate this court's consistent ruling on this issue. *See also People v. Ross*, 129 N.Y.S. 3d 629, 640-41 (N.Y. Sup. Ct. 2020) (applying *Frye* test to ballistics identification, determining the test is satisfied with regard to the relevant community's general consensus of class characteristics of ballistics identification, rejecting a challenge to "all expert testimony on toolmarks").

contends the court erred because the underlying ballistics identification methodology on which Coric relied to form her opinion is itself unreliable.

The State responds that Phillips has not established an abuse of discretion because his challenge to Coric's expertise and opinion is predicated not on her experience or training or her application of the AFTE methodology to the evidence presented at trial but, rather, on the reliability of the AFTE methodology in general. According to the State, Phillips' contention is a question of weight for the fact-finder once such evidence is deemed admissible pursuant to the *Frye* standard, not a basis to exclude her testimony under ER 702. We agree with the State.

We review a trial court's determination as to the admissibility of evidence for abuse of discretion. *Roberts*, 32 Wn. App. 2d at 599.

> "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). "The party challenging an evidentiary ruling bears the burden of proving the trial court abused its discretion." *State v. Briejer*, 172 Wn. App. 209, 223, 289 P.3d 698 (2012).

*Id.* (footnote omitted).

"If the *Frye* test is satisfied, the trial court must then determine whether expert testimony should be admitted under the two-part test of ER 702." *Copeland*, 130 Wn.2d at 256. We have stated that

> [u]nder ER 702, the trial court may allow an expert witness to testify in the form of an opinion concerning "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence." Expert testimony is admissible if the witness is qualified as an expert and the testimony is helpful to the finder of fact. *State v. Morales*, 196 Wn. App. 106, 122, 383 P.3d 539 (2016). Such testimony is helpful to the fact finder "'if it concerns matters beyond the common knowledge of the average layperson

and is not misleading.'" *Id.* at 122-23 (quoting *State v. Groth*, 163 Wn. App. 548, 564, 261 P.3d 183 (2011)).

*Roberts*, 32 Wn. App. 2d at 599. "Courts generally 'interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases.'" *Groth*, 162 Wn. App. at 564 (internal quotation marks omitted) (quoting *Moore v. Hagge*, 158 Wn. App. 137, 155, 241 P.3d 787 (2010)).

Once again, after a particular methodology has been determined to be generally accepted in the relevant scientific community under *Frye*, "application of the science to a particular case is a matter of weight and admissibility under ER 702." *Gregory*, 158 Wn.2d at 829.

Notably, at oral argument on appeal, the State elaborated on the relationship between the AFTE methodology, the *Frye* test, and ER 702:

> [T]he firearm and tool mark examination theory includes a process inside of it. It includes a framework by which examiners must operate. . . . Where the State is asserting [that an expert] adhered to the AFTE requirements[,] [where] there's nothing in the record here to say [that the expert] did not follow those requirements, where those requirements are set by the industry standard, essentially the same scientific community, and the expert adheres to those requirements, . . . the [ER] 702 analysis is pretty limited. The challenge is to what would essentially be raised in a *Frye* hearing, [it] can cast doubt on the reliability of the evidence at trial[;] weight, not admissibility.[18]

Here, Phillips' argument before the trial court was that because the ballistics identification methodology on which Coric relied was itself unreliable, Coric was unqualified as an expert and her testimony was unhelpful to the jury. Phillips did not otherwise challenge Coric's application of that methodology to the shell casings that

---

[18] Wash. Ct. of Appeals oral arg., *State v. Phillips*, No. 85658-8-I (Mar. 5, 2025), at 13 min., 55 sec., *video recording by* TVW, Washington State's Public Affair's Network, https://tvw.org/video/division-1-court-of-appeals-2025031161/.

she examined herein, her qualifications to testify as an expert witness, or the helpfulness of her testimony to the jury.

The State asserted in response that Coric

has both the formal education and training to testify as an expert. She has been employed by the Washington State Patrol Crime Laboratory for 9 years. She also has a master's degree in forensic science and will testify that she has both taken courses in school, and received training that specifically addressed firearms, ballistics, and corresponding analysis. She has also previously testified as an expert numerous times.

. . . .

Here, the State will be calling FS Coric to testify in her capacity as a forensic scientist related to the testing she did on shell casing test fired from the 10 mm semi-automatic handgun found next to where the Defendant had been sitting on the bench seat of the yellow moving truck he had been driving. Under the rules regarding expert testimony, Coric' testimony is perfectly legal, and is specifically what is contemplated by ER 702.

The State added that Phillips' challenge to the reliability of the AFTE methodology is "ripe for cross-examination, ripe for the jury to consider, things they can question her about, things that she can answer. And the jury can judge her answers and decide what weight to give her opinion."[19] After considering both parties' arguments, the trial court denied Phillips' ER 702 motion.[20]

---

[19] The State further indicated that the jury could be provided with an "instruction regarding expert opinions and the weight under the law that jurors are supposed to give when considering those." The trial court later instructed the jury as follows:

INSTRUCTION NO. 6

A witness who has special training, education or experience in a particular science, profession or calling, may be allowed to express an opinion in addition to giving testimony as to facts. You are not bound, however, by such an opinion. In determining the credibility and weight to be given such opinion evidence, you may consider, among other things, the education, training, experience, knowledge and ability of that witness, the reasons given for the opinion, the sources of the witness' information, together with the factors already given you for evaluating the testimony of any other witness.

(Boldface omitted.)

[20] The denial of Phillips' ER 702 motion was contingent on the State successfully establishing the requisite foundation for Coric to testify as an expert witness on ballistics

The trial court did not abuse its discretion as to that ruling. Phillips did not contest whether Coric possessed the requisite professional expertise to testify as an expert with regard to the AFTE methodology or whether her specific testimony linking the shell casings identified at the scene of the discharge to the test-fired shell casings would be helpful to the jury. Instead, he challenged the general reliability of the ballistics identification methodology employed by Coric. In so doing, Phillips was either attempting to dispute the validity of the underlying methodology, which is the domain of the *Frye* standard and not applicable to an ER 702 challenge, or attempting to argue that her testimony should be entitled to less weight, which falls within the purview of the fact-finder and is also not applicable to an ER 702 challenge. Nevertheless, neither of the bases presented by Phillips is one on which Coric's testimony should have been excluded pursuant to ER 702.

Moreover, Coric was plainly qualified to testify as an expert given her training and experience, and due to the circumstantial nature of the evidence in this case, Coric's testimony helpfully supplemented the State's evidence. Accordingly, the trial court did not abuse its discretion when it denied Phillips' ER 702 motion.

Phillips nevertheless asserts that if we were to conclude that the trial court erred by admitting Coric's ballistics identification testimony (which we do not), the trial court's error prejudiced him. The State responds that Coric's testimony was not the primary source of evidence connecting the 10-millimeter firearm seized from the yellow moving truck to the scene of the discharge but, rather, served to corroborate the other evidence presented at trial in support of that proposition. Therefore,

identification. The trial court later ruled that the State had established such foundation, Phillips did not object to that subsequent ruling, and Phillips does not assign error to it on appeal.

according to the State, any such error arising from admitting Coric's testimony would have been harmless. The State is correct.

"The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). In its brief on appeal, the State contends as follows:

> The testimony provided by Dijana Coric only corroborated other testimony by the State related to the drive-by shooting charge. Multiple witnesses connected the shots they heard with the speeding yellow truck leaving the scene seconds later. Absent Ms. Coric's testimony, the State would still have presented the defendant's admission to officers that he would do five years for the gun, the officers' recovery of a 10 mm pistol from the seat of the yellow truck, discovery of the uncommon 10 mm caliber ammunition found in the locked rear portion of the yellow truck, a matching headstamp between the 10 mm ammunition in the box truck and the casings found at the scene.
>    Even if the defendant could demonstrate the lower court erred by admitting the testimony of Dijana Coric, any prejudice that resulted from the opinion offered is minimal in light of the caveated testimony[21] and the remaining unchallenged evidence against the defendant.

The State's argument is persuasive. The evidence adduced at trial reflects that Coric's testimony was corroborated by that of other witnesses and by various exhibits presented at trial. Furthermore, Coric's opinion was limited in scope: the substance of her testimony on this point was not that the 10-millimeter firearm seized from the yellow moving truck was the only such firearm capable of resulting in the shell casings discovered at the scene of the discharge but, rather, that it had fired the shell casings uncovered at the scene of the discharge. Therefore, if the trial court erred, which it did not, any error would have been harmless.

---

[21] Coric expressly indicated on cross-examination that it was not her testimony that the casings in question could not have been fired by any other firearm.

III.     Second Amendment As-Applied Challenge To UPF1 Conviction

Phillips next asserts that the statutory scheme resulting in his conviction of UPF1 represents an unconstitutional permanent deprivation of his right to bear arms pursuant to the Second Amendment to the United States Constitution as applied to him.  We disagree.

The facts and analysis of our recent decision in *State v. Hamilton* guide our analysis here.   33 Wn. App. 2d 859, 565 P.3d 595 (2025), *review granted*, No. 104072-5 (Wash. Aug. 6, 2025).   There, Hamilton asserted that "Washington's statutes that restrict the firearms rights of persons with felony convictions violate the Second Amendment to the United States Constitution as applied to him." *Id.* at 861. Reviewing his constitutional challenge de novo, we recited the applicable legal standard as follows:

> The Second Amendment states, "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."  "[T]he right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *United States v. Rahimi*, 602 U.S. 680, 690, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 778, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)).
> However, "the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).  In *Heller*, the Supreme Court held that a Washington D.C. law prohibiting handgun possession in the home was unconstitutional. *Id.* at 635.  Notably, the Court clarified the Second Amendment right to possess firearms belongs to "law-abiding, responsible citizens" and emphasized that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," among other limitations. *Id.* at 635, 626.  Such regulations, *Heller* specified, are "presumptively lawful." *Id.* at 627 n.26.

*Id.* at 864.

We then traced the recent development of the United States Supreme Court's Second Amendment jurisprudence and explained that in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022), the Court established a new framework for evaluating Second Amendment challenges. *Id.* at 865-66. We summarized the Court's newly announced two-step test as follows: "First, courts must determine whether 'the Second Amendment's plain text covers an individual's conduct.' [*N.Y. State Rifle*, 597 U.S. at 17.] If so, 'the Constitution presumptively protects that conduct,' and 'the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.' *Id.*" *Hamilton*, 33 Wn. App. 2d at 866.

In rejecting Hamilton's challenge on appeal, we held as follows:

> As to *New York State Rifle*'s first step, we presume that felons are among "the people" protected by the Second Amendment. *See Rahimi*, 602 U.S. 690-92 (assuming defendant was protected by Second Amendment and deciding case based on *New York State Rifle*'s second step); *Heller*, 554 U.S. at 580 (noting "the people" "unambiguously refers to all members of the political community, not an unspecified subset"); [*United States v.*] *Díaz*, 116 F.4th [458,] 467 [(5th Cir. 2024)] ("[T]he 'two-step' view of [*New York State Rifle*] is effectively collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation.").
>
> As to *New York State Rifle*'s second step, we conclude that disarming those with felony convictions is demonstrably consistent with America's historic tradition of firearms regulation. *Common law has a long history of disarming individuals, or categories of individuals, who were viewed as a danger to public order*. *See* [*United States v.*] *Williams*, 113 F.4th [637,] 650-57 [(6th Cir. 2024)] (providing detailed historical summary and concluding "governments in England and colonial America long disarmed groups that they deemed to be dangerous"); Joseph G.S. Greenlee, *The Historical Justification For Prohibiting Dangerous Persons From Possessing Arms*, 20 WYO. L. REV. 249, 272 (2020) ("[T]he historical justification for felon bans reveals one controlling principal that applies to each historical period: violent or otherwise dangerous persons could be disarmed."); R. Brian Tracz, Comment, *Bruen and the Gun Rights of Pretrial Defendants*,

172 U. PENN. L. REV. 1701, 1719 (2024) (providing historical overview showing "substantial burdens were placed on the rights of dangerous people to possess firearms before, at, and directly after the founding").

*Id.* at 870-71 (emphasis added) (some alterations in original). We emphasized that Washington's disarming statutes address a societal problem that existed at the time of our nation's founding: "disarming of those who posed a threat of violence to others." *Id.* at 873. As we explained,

> At the time of our nation's founding, "[f]elonies were so connected with capital punishment that it was 'hard to separate them.'" *Medina v. Whitaker*, 913 F.3d 152, 158, 439 U.S. App. D.C. 294 (2019) (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *98). The death penalty served as a means for "'preventing crimes in the future; [and] it was also a backward-looking effort at purging the community of guilt for crimes committed in the past.'" *Williams*, 113 F.4th at 658 (alteration in original) (quoting STUART BANNER, THE DEATH PENALTY: AN AMERICAN HISTORY 15 (2009)). "The key idea was that capital punishment would 'prevent existing criminals from repeating their crimes.'" *Id.* (quoting BANNER, *supra*, at 13). The range of felony cases punishable by death then was quite broad and "included nonviolent offenses that we would recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina*, 913 F.3d at 158. Early legislatures "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property. *United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024). "[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158. Washington has eliminated the death penalty, the ultimate deprivation of individual rights, but a mandatory life sentence without parole similarly subsumes disarmament.

*Id.* at 873 (alterations in original).

Here, the UPF1 statute under which Phillips was convicted forbids an individual from possessing a firearm when, as pertinent here, the individual has been convicted of a serious offense. RCW 9.41.040(1)(a). Our legislature defined a serious offense, as pertinent here, as "any of the following felonies or a felony

attempt to commit any of the following felonies, as now existing or hereafter amended: (a) Any crime of violence." RCW 9.41.010(42).

Phillips was convicted of assault in the second degree pursuant to RCW 9A.36.021(1)(c) in King County Superior Court in 1996. Our legislature established this crime as a class B felony and defined it as follows: "A person is guilty of assault in the second degree if [they], under circumstances not amounting to assault in the first degree: . . . Assault[] another with a deadly weapon." RCW 9A.36.021(2)(a), .021(1)(c). Considering the relevant statutes together, assault in the second degree is a felony and a crime of violence, and thus, the UPF1 statute has the effect of criminalizing possession of a firearm by an individual convicted of assault in the second degree.

On appeal, Phillips asserts that such a statutory framework is an unconstitutional permanent deprivation of his right to possess a firearm as applied to him. This is so, according to Phillips, because restricting his right to bear arms based on his prior violent felony conviction is inconsistent with the historical tradition of our nation.[22]

Phillips' argument fails. He was convicted of a violent felony for his conduct amounting to physical violence against a member of the public with a deadly weapon. Such a conviction places Phillips squarely in the category of persons deemed dangerous to the public order for the purpose of historical firearms regulation. *See Hamilton*, 33 Wn. App. 2d at 870-71. Accordingly, a statutory

---

[22] Phillips also contends that he is included as among "the people" for the purpose of the protections of the Second Amendment. As in *Hamilton*, for the purpose of the first step in *New York State Rifle*, we presume that Phillips is counted among "the people." 33 Wn. App. 2d at 870.

framework depriving him of the right to bear arms is consistent with the historical tradition of our nation. Thus, the statutory framework he challenges is not unconstitutional as applied to him. Accordingly, Phillips does not establish an entitlement to appellate relief.[23]

IV.    Statement of Additional Grounds for Review

Phillips presents two additional grounds for relief on appeal in his statement of additional grounds for review (SAG). Neither have merit.

Phillips first contends as follows:

> October 2, 2022 I was booked into Snohomish Co. Jail for possesion [sic] of a *stolen* firearm, DUI, reckless endangerment. A day or 2 later after issuing and executing a search warrant they changed the poss [sic] of stolen firarm [sic] to unlawful possesion [sic] of firearm 1st degree. How did they know it was a *stolen* firearm before the issuance and execution of a search warrant?

This claim misstates the record in this matter and, based on the record herein, he does not establish error or prejudice.

Here, on October 3, 2022, one day after the incident at issue, EPD Detective Sergeant Ryan Speer wrote the "Synopsis/[Probable Cause] for Arrest" describing, in pertinent part, the following:

> The sole occupant of the suspect vehicle was ultimately arrested by Mountlake Terrace PD on a variety of misdemeanor traffic charges, to include DUI, DWLS[24] 3, Ignition Interlock Device Restriction,

---

[23] Phillips also asserts that his UPF1 conviction is unconstitutional because he has completed all of the terms of his sentence arising from his conviction of assault in the second degree. However, he did not present this argument to the trial court nor does he offer citation to the record or other evidence in support of establishing as much on appeal. Therefore, he has not demonstrated that such an error is "manifest" for the purpose of reviewing such a claim for the first time on appeal. *See* RAP 2.5(a). We thus decline to consider it.

[24] Common abbreviation for the simple misdemeanor crime of driving while license invalidated in the third degree. RCW 46.20.342. Previous versions of the statute referred to the crime as driving with license suspended or revoked (DWLS) and the acronym remains in use by

Obstructing a Law Enforcement Officer, and Refusal to Give Information. In addition, a black semi-automatic pistol was visible on the seat of the vehicle.

A search warrant of the moving truck was later issued by the Edmonds Municipal Court and executed by Speer and Allen who reported as follows:

Located in the front seat partially covered by a dark gray work jacket was the black semi-automatic pistol. The slide was locked to the rear and a partially-inserted but empty pistol magazine was in the magazine well. The pistol with S/N MT49643 clearly visible. A check of that firearm through SnoCom showed it was reported stolen by Tacoma PD. . . .

Based on this investigation, probable cause exists to charge Phillips with the crimes of:

Possession of a Stolen Firearm
. . . .
Unlawful Possession of a Firearm 1st Degree
. . . .
Reckless Endangerment.

The record plainly establishes that Phillips was not booked into Snohomish County Jail on a charge of possession of a stolen firearm but, rather, on charges of "DUI, DWLS 3, Ignition Interlock Device Restriction, Obstructing a Law Enforcement Officer, and Refusal to Give Information." The firearm in question was not seized until after a search warrant had been issued. The issuance of this search warrant had been based, in part, on the presence of a firearm in the passenger cabin of the truck that was visible from the exterior of the vehicle. It was not until after the firearm was seized and its identification number was entered into a database of stolen firearms that its connection to a reportedly stolen firearm was made.

many criminal law practitioners and law enforcement officers despite the change to the title of the relevant statute. *See* former RCW 46.20.342 (1998).

Furthermore, nothing in the record suggests that Phillips was booked into jail or charged by the prosecution with possession of a stolen firearm in this matter. Notably, although Speer indicated that probable cause existed to charge Phillips with the crime of possession of a stolen firearm, neither the original information nor the amended information reflect that he was ever so charged and the "to convict" instructions provided to the jury did not include that crime. Given that he was never booked or charged with the crime of possession of a stolen firearm, he does not establish error or prejudice and does not prevail on this issue.

Phillips next states that certain camera footage taken from the dashboard video camera of a law enforcement vehicle would exonerate him of his convictions of drive-by shooting and unlawful possession of a firearm in the first degree. RAP 10.10(c) provides that "[o]nly documents that are contained in the record on review should be attached or referred to in the statement." Because the camera footage he references is not contained in the record on review, this SAG issue cannot be considered. We therefore decline to reach the merits of this challenge.

Affirmed.

_____

WE CONCUR:

_____          _____
Díaz, J.                                                      Chung, J.